PILAROWSKI v BROWN

1. MANDAMUS—CONDITIONS FOR ISSUANCE—LEGAL RIGHT—LEGAL
   DUTY—DISCRETIONARY WRIT—EXTRAORDINARY REMEDY.
   A writ of mandamus will issue only if plaintiff proves he has a
   clear legal right to performance of the specific duty sought to
   be compelled and that defendant has a clear legal duty to
   perform such act; mandamus is both a discretionary and an
   extraordinary remedy, not to be entertained lightly and may
   issue only under limited circumstances.

2. MANDAMUS—PUBLIC OFFICIAL—LEGAL DUTY—DISCRETIONARY
   WRIT—MINISTERIAL NATURE—OFFICIAL'S DISCRETION—COURTS—
   COURT ORDERS.
   Mandamus is a discretionary writ and will issue against a public
   official to compel the enforcement of a clear legal duty; ordinar-
   ily, the act requested must be of a ministerial nature, although
   it may involve some measure of discretion, and if the public
   officer failed to obey a statute the courts may order him to do
   so.

3. CONSTITUTIONAL LAW—FIRST AMENDMENT RIGHTS—PUBLIC EM-
   PLOYEES—STATE INTERESTS—SPEECH REGULATION.
   It cannot be gainsaid that the state has interests as an employer
   in regulating the speech of its employees that differ signifi-
   cantly from those it possesses in connection with regulation of
   the speech of the citizenry in general.

4. CONSTITUTIONAL LAW—CONDITIONS OF EMPLOYMENT—REASONABLE-
   NESS.
   The theory that public employment which may be denied alto-

REFERENCES FOR POINTS IN HEADNOTES
[1] 52 Am Jur 2d, Mandamus §§ 5, 31.
[2] 52 Am Jur 2d, Mandamus §§ 128, 166.
[3–14] 16 Am Jur 2d, Constitutional Law § 345 et seq.
   56 Am Jur 2d, Municipal Corporations, Counties, and Other Politi-
   cal Subdivisions § 245.
[10–15] 63 Am Jur 2d, Public Officers and Employees §§ 189 et seq.,
   237.
[15] 63 Am Jur 2d, Public Officers and Employees § 273.

gether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.

5. CONSTITUTIONAL LAW—FIRST AMENDMENT RIGHTS—PUBLIC EMPLOYEE INTERESTS—STATE INTERESTS—BALANCING TEST.

The First Amendment problem regarding the rights of a state employee to express himself in a state and a public employee situation is to arrive at a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.

6. CONSTITUTIONAL LAW—FREEDOM OF BELIEF—PROTECTION OF CONSTITUTIONAL RIGHTS.

An individual's freedom of belief must be zealously protected because it is a "fixed star in our constitutional constellation" and is central to our form of government.

7. CONSTITUTIONAL LAW—FIRST AMENDMENT RIGHTS—DEBATE—UNINHIBITED—ROBUST—WIDE-OPEN—GOVERNMENT POLICIES—ELECTORAL PROCESS.

First Amendment protections reflect a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, a principle itself reflective of the fundamental understanding that competition in ideas and governmental policies is at the core of our electoral process.

8. CONSTITUTIONAL LAW—PUBLIC EMPLOYERS—FREEDOM OF BELIEFS—COMPROMISE OF BELIEFS—PLEDGE OF ALLEGIANCE.

A public employer's desire to exact a compromise of an employee's true beliefs by pledging allegiance or to remain silent concerning the county and his employers is such a barrier to the free flow of political discourse in our society that it cannot be sustained; a pledge of allegiance to another party, however ostensible, only serves to compromise the individual's true beliefs.

9. CONSTITUTIONAL LAW—PUBLIC EMPLOYEE'S RIGHTS—PERVASIVE GOVERNMENTAL EMPLOYMENT—STARVATION OF POLITICAL OPPOSITION—FINANCIAL STARVATION.

A public employee's rights should be scrupulously regarded because as governmental employment becomes more pervasive the greater the dependence on it becomes and, therefore, the greater becomes the power to starve political opposition by commanding partisan support, financial or otherwise.

10. Constitutional Law—Public Employees—Termination of Employment—Creation of Animosity—Public Employers—Burden of Proof—Employee and Employer Interests—Freedom of Expression.

Termination of a plaintiff's employment as an assistant in a county health department because his letter writing criticized the department and the county commissioners, resulting in animosity by commission members and a fear that this animosity would make funding difficult for the board of health, creates a burden on defendants to prove that avoidance of such friction with the commissioners is a vital state interest and that this interest clearly outweighs plaintiff's right to freedom of expression.

11. Counties—Constitutional Law—Public Employee—First Amendment Rights—Board of Commissioners—Letter Writing—Criticism—Public Service.

The members of a board of county commissioners sit as the elective representatives of the community and if excessive funding requests or unnecessary projects are being approved for unwarranted reasons, an employee, who is an assistant in the county health department, is performing a public service in bringing these matters to public view by writing letters outside of the scope of his activities within the health department which criticize the department and the commissioners.

12. Appeal and Error—Counties—Discharge of Public Employee—Retaliation—Rejection of Projects—Detriment of the Public.

The discharge of an assistant in a county health department for writing letters of criticism against the department and the county commissioners should not be upheld by the Court of Appeals because of a fear that the commissioners would attempt to retaliate against this single employee by rejecting meritorious projects to the detriment of the entire public.

13. Constitutional Law—Public Employee Discharge—Policymaking—Political Beliefs—First Amendment Rights—Forfeiture.

The language of a United States Supreme Court Justice which states in a concurring opinion that a nonpolicymaking, nonconfidential government employee cannot be discharged from a job that he is satisfactorily performing upon the sole ground of his political beliefs, can hardly be used to support an argument that a policymaking public employee forfeited all of his rights to speak on matters of local public concern outside the confines

of his department by taking the policymaking position within his department.

14. APPEAL AND ERROR—CONSTITUTIONAL LAW—FIRST AMENDMENT RIGHTS—PUBLIC EMPLOYER'S INTERESTS—BALANCING OF INTERESTS—JUSTIFICATION FOR EMPLOYER TERMINATION.

A remand to the trial court is the appropriate remedy where an assistant in a county health department was terminated from his employment for writing letters of criticism against the department and the county commissioners, so that the trial court may balance the employee's First Amendment rights against the vital and legitimate interest, if any, of his public employer where insufficient proofs were taken on this point; the employer should be allowed an opportunity to present any other justification it might have for the employee's termination.

15. CONSTITUTIONAL LAW—PUBLIC EMPLOYEE—POLICYMAKING—FIRST AMENDMENT RIGHTS—BALANCING OF INTERESTS—EMPLOYEE TERMINATION—PRESUMPTIONS.

The terms policymaking and nonpolicymaking in public employment are not easily defined; an employee whose responsibilities have only limited and well defined objectives is a nonpolicymaking employee, while an employee whose responsibilities are not well defined or are broad in scope is more likely in a policymaking position; even where a public employee is a policymaker, his First Amendment rights must be balanced against the interests of his employer; policymaking could have a bearing on the propriety of the termination of employment, but if the policymaking issue is close, the presumption to be utilized is that the employee is a nonpolicymaker.

Appeal from Macomb, Edward J. Gallagher, J. Submitted March 9, 1977, at Lansing. (Docket No. 31288.) Decided July 7, 1977.

Complaint for mandamus by John Pilarowski against Leland Brown, M.D., Macomb County Health Department, Macomb County Board of Commissioners and Robert Verkuilen to direct defendants to reinstate plaintiff to his former position of employment as an administrative assistant to the Macomb County Health Department and for damages and for other temporary and permanent

injunctive relief. Summary judgment for defendants. Plaintiff appeals. Remanded with instructions.

*Charfoos & Charfoos, P. C.* (by *Thomas H. Bleakley)* for plaintiff.

*Philip J. Anderson,* Chief Civil Counsel, Macomb County, for defendants.

Before: D. F. WALSH, P. J., and ALLEN and N. J. KAUFMAN, JJ.

N. J. KAUFMAN, J. This case involves the discharge of plaintiff as an administrative assistant to the Macomb County Health Department. It is plaintiff's position that this action resulted solely from plaintiff's letter-writing activities which criticized the actions of various local elected officials as inimical to the welfare of the county's residents. Plaintiff claims it is too plain for argument that this dismissal impermissibly punishes the exercise of his First Amendment rights to speak freely on matters of public concern; accordingly, correction of this alleged egregious injury was requested by way of a variety of remedies set forth in plaintiff's complaint in the Macomb County Circuit Court. First, plaintiff requested that a writ of mandamus issue directing that he be reinstated to his former position of employment, citing violations of 42 USCA 1983[1] as justification for the necessity of the

---

[1] Section 1983:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

relief. Next, damages were asked for, resulting from the purported violations of 42 USCA 1985.[2] Finally, the original complaint was amended to include a request for temporary and permanent injunctive relief against the defendants because of their continued wrongful actions in denying him his employment, again citing 42 USCA 1983 in support. All of plaintiff's contentions were either rejected or not ruled upon by the circuit judge and are here now on appeal, as the circuit judge was of the view that mandamus or any other type of injunctive relief was inappropriate in the instant case and, therefore, granted the defendants their requested summary judgment.

As noted above, the case was spawned by the prolific pen of the plaintiff. Plaintiff's days as a writer began in December, 1974, when he composed the first of 13 letters to the Macomb Daily, a daily newspaper distributed in the Macomb County area, expressing his disagreement with the actions of certain elected officials. (See Appendix A.) None of these letters disclosed plaintiff's position within the county's bureaucracy; instead, they appeared to be the voicings of a concerned citizen.

Plaintiff's letter-writing did not stop here. He was not adverse to composing a letter or two to the particular official with whom he was displeased. Specifically, on July 20, 1976, plaintiff wrote a letter to Robert Verkuilen, chairman of the Macomb County Board of Commissioners, voicing his objections to the actions of the board, with particular emphasis on what he perceived to be unwise fiscal expenditures. (See Appendix B.)

The record indicates that the force and vitality of plaintiff's remarks were not well received by the

---

[2] Because of the length of this provision, we think it necessary only to recite the title: "§ 1985. Conspiracy to interfere with civil rights—Preventing officer from performing duties".

members of the board. As a result of this letter, the following occurred, as testified to by Dr. Leland Brown, director of the health department, in his deposition:

"Q Could you describe the substance of your meeting with Mr. Pilarowski on July 28th, 1976 at which time he was fired? Basically what transpired?

"A Basically I asked him if he wouldn't step in my office when he had a moment in whatever it was he was doing. When he finished, he came in.

"I handed him a copy of whatever letter it was and asked him, did you indeed write this, since the one I had was not signed, signature didn't appear on it.

"He acknowledged the letter. And I indicated to him that we had talked about this problem of his activities contributing to the deteriorating public relations we were having with the political entity and that he was, therefore, terminated.

"Q Could you describe the document that you had in your hand at the time?

"A It was a copy of a letter from Mr. Pilarowski to, I believe, Mr. Verkuilen with a copy to Lou Gordon.

"Q Could you describe how it came about that you had possession of this letter?

"A Yes. Sometime late in the afternoon of the, I believe it was the day previous I received a call from one of the Commissioners who said that he was quite disturbed about the obligations [sic] in this letter.

"He didn't appreciate it.

\*　\*　\*

"Q Would it be fair to state that in fact this letter di [sic] [did] precipitate the firing of Mr. Pilarowski?

"A That would be fair to say."

Subsequently, plaintiff appealed Brown's decision to the Macomb County Board of Health which stated, in part, the following in upholding Brown's decision:

"It is therefore readily obvious that any person occupying such a responsible position must conduct his office and affairs, both on and off duty so as not to bring discredit or disfavor upon the department or to do any act or omission which would affect ultimately the protection and promotion of the public health of the citizens of this county.

"Our independent investigation as well as giving due consideration to the statement of Dr. Brown and Mr. Pilarowski lead us to one conclusion, namely, that in our judgment Dr. Brown on more than one occasion made known to his administrative assistant that the operation and function of the department of health was being seriously undermined and deteriorating, and that the employee in question's conduct must cease or face termination, which fact was acknowledged by the employee as when notified of termination by Dr. Brown, stated that he was expecting same.

"After giving due consideration to all matters of inquiry and aspects of this case it is the position of the Health Board to support the actions of its director with regard to his selection and termination of administrative assistants.

"To hold otherwise would result in the Health Board becoming involved in the day to day problems confronting all health department employees which is contrary to the statute creating the County Health Department and its Board of Health."

As we have noted, the dispute was thereafter placed in the lap of the circuit judge who ruled that he was not empowered to grant plaintiff relief. Plaintiff now contends this was error.

Our initial problem in resolving this appeal does not lie on a constitutional level. Rather, it requires consideration of the trial judge's ruling that mandamus was unavailable to plaintiff. The requirements necessary for the issuance of a writ of mandamus have been outlined by this Court in *Dettore v Brighton Township,* 58 Mich App 652, 654–655; 228 NW2d 508 (1975):

" 'A writ of mandamus will issue only if plaintiffs prove they have a "clear legal right to performance of the specific duty sought to be compelled" and that defendant has a "clear legal duty to perform such act" '.

\* \* \*

"It is evident, then, that mandamus is both a discretionary and an extraordinary remedy. It is not to be entertained lightly and may issue only under limited circumstances. Accordingly, we must assess the factual matrix of the present case to determine whether the trial judge abused his discretion in denying the writ of mandamus as prayed for. If either Dettore does not have a 'clear legal right' to the relief requested or the township board does not have a 'clear legal duty' to perform the act requested, then the writ was properly denied."

Similarly, in *Lundberg v Corrections Commission,* 57 Mich App 327, 329; 225 NW2d 752 (1975), it was said:

"Mandamus is a discretionary writ and will issue against a public official only to compel the enforcement of a clear legal duty. *Livonia Drive-In Theatre v Livonia,* 363 Mich 438; 109 NW2d 837 (1961). Ordinarily the act requested must be of a ministerial nature. However, the execution thereof may involve some measure of discretion. *Michigan Dental Society v Secretary of State,* 294 Mich 503; 293 NW 865 (1940). If the act requires some discretion but is mandated by statute and the officer failed to carry out the provisions of the statute the courts may order him to do so. *Bischoff v County of Wayne,* 320 Mich 376; 31 NW2d 798 (1948)."

Having stated these well-established principles, we turn to the question of whether there are circumstances herein which would justify the issuance of a writ of mandamus. On this point, we must disagree with the trial judge. Any other conclusion would disregard the fact that if the

.claims of the plaintiff are sustained, they translate into a mandatory obligation on the part of the defendants to reinstate plaintiff and require only a ministerial act on their part. See *Meiland v Wayne Probate Judge,* 359 Mich 78; 101 NW2d 336 (1960), and *Toan v McGinn,* 271 Mich 28; 260 NW 108 (1935). This remedy is especially appropriate because, as we will note later, of the strength of plaintiff's claims. Of course, it is possible plaintiff may not be entitled to the relief he seeks; but this goes not to the maintenance of the action at all but, rather, to the issuance or denial of the writ.

With this decided, we must now examine the merits of plaintiff's claims. We begin our inquiry fully aware that "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general".[3] However, "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected".[4] Thus, " '[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees' ".[5] Moreover, we zealously protect the individual's freedom of belief because it is a "fixed star in our constitutional

---

[3] *Phillips v City of Flint,* 57 Mich App 394, 400; 225 NW2d 780 (1975), quoting from *Pickering v Board of Education,* 391 US 563, 568; 88 S Ct 1731; 20 L Ed 2d 811 (1968).

[4] *Keyishian v Board of Regents,* 385 US 589, 605–606; 87 S Ct 675; 17 L Ed 2d 629 (1967).

[5] *Phillips, supra,* at 400, again quoting *Pickering, supra.*

constellation", indeed, it is "central" to our form of government.[6] "These protections reflect our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open,' [citation omitted], a principle itself reflective of the fundamental understanding that competition in ideas and governmental policies is at the core of our electoral process."[7]

Despite the foregoing fundamental doctrine, the defendants insist that denial of plaintiff's employment, because of his comments on matters of public concern, does not work a violation of plaintiff's First Amendment rights. A combination of factors impels us to disagree with them.

Plaintiff lost his job of some seven years as a direct consequence of his continued exercise of his right to freedom of speech. What the defendants wanted to exact from the plaintiff was a compromise of his true beliefs by pledging allegiance, or at a minimum silence, to incumbent elected officials and their actions. The principles we have earlier set out admonish us against sustaining such a barrier to the free flow of political discourse in our society. This is because "even a pledge of allegiance to another party, however ostensible, only serves to compromise the individual's true beliefs".[8] Moreover, we should scrupulously regard the rights of plaintiff because "[a]s governmental employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to starve political opposition by commanding partisan

---

[6] *Elrod v Burns*, 427 US 347, 356; 96 S Ct 2673; 49 L Ed 2d 547 (1976).

[7] *New York Times Co v Sullivan*, 376 US 254, 270; 84 S Ct 710; 11 L Ed 2d 686; 95 ALR2d 1412 (1964).

[8] *Burns, supra*, 427 US 347, 355.

support, financial and otherwise".[9] In the instant case, we find a classic example of how true this wise counsel is.

The uncontroverted justification offered by the defendants to support the termination of plaintiff's employment is that plaintiff's letter writing was creating animosity against him by members of the Macomb County Board of Commissioners, and that there was a fear that this animosity would cause problems in obtaining funds and various approvals for the board of health's actions.[10]

In examining the forcefulness of this argument, it may be conceded that plaintiff's activities did cause such animosity. Nevertheless, the defendant has the burden to prove that avoidance of such friction with the commissioners is a vital state interest and that this interest clearly outweighs plaintiff's right to freedom of expression. We think the rationale of the many cases quoted above defeats any such argument on the part of the defendants. Plaintiff's criticism dealt with matters outside the scope of his activities within the department. The board of commissioners sit as the elective representative of their community. If excessive funding requests and frivolous or unnecessary projects were being approved by them for unwarranted reasons, then plaintiff was performing a public service in bringing these matters to public view. Moreover, it would be perverse for this Court to uphold plaintiff's discharge because of a fear that the commissioners would attempt to retaliate against a single employee of the County Health Department by rejecting meritorious projects and funding requests to the detriment of the

---

[9] *Burns, supra,* 427 US 347, 356.

[10] It is particularly interesting to note that it is conceded by the defendants that as a result of their action in dismissing the plaintiff the morale among the health department employees has plummeted.

entire public. Indeed, if the board does operate in such a manner, and we have no evidence aside from plaintiff's letter that it does, then Macomb County needs more letter writing and public debate, not less, to disclose these evils. Obviously, this type of justification must fall.

The defendants next request that we stop and consider whether the plaintiff was a policymaking employee. They assert that the effect of such a ruling would be, in effect, to discount the entire value of our previous discussion and tie our hands in our ability to grant plaintiff any relief. Particular reliance for this proposition is placed on the following language from the concurring opinion of Mr. Justice Stewart in *Burns, supra* at 427 US 375:

> "The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot. See *Perry v Sindermann*, 408 US 593, 597–598; 92 S Ct 2694; 33 L Ed 2d 570."

Taken at its face value, this language can hardly be used to support an argument that plaintiff forfeited all of his rights to speak on matters of local public concern outside the confines of his department by taking a policymaking position within his department. Surely, to conclude otherwise would do violence to all of the principles heretofore cited. We do not say, however, that it does not have some bearing on the propriety of plaintiff's termination but, rather, say that a close examination must be engaged in under the *Picker-*

*ing* balancing test even when the public employee is a policymaker.

Of course, the above discussion presupposes that the plaintiff is a policymaking employee and, as the defendants properly point out, because of the trial court's disposition, insufficient proofs were taken on this point; accordingly, a remand is appropriate on this issue. Moreover, again because of the circuit judge's earlier ruling, the defendants must be offered the opportunity to present any other justifications they might have for terminating the plaintiff's employment.

For guidance in the trial judge's ruling on whether plaintiff was a policymaking employee we point to the language in *Burns,* at 427 US 367. There the Supreme Court recognized that the terms "policymaking" and "nonpolicymaking" are not easily susceptible of definition, but the Court did observe that an employee whose responsibilities have only limited and well defined objectives is a nonpolicymaking employee, while an employee whose responsibilities are not well defined or are of broad scope is more likely in a policymaking position. Also to be considered is:

"whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Id,* at 368.

We, however, express our doubt that defendants will be able to prevail. In the instant case, the health board's statement casts doubt on whether the plaintiff was a policymaking employee; the statement saying plaintiff executes the policies formulated by the board under the direction of defendant Brown. Moreover, if the issue is close, the presumption to be utilized is that he is a nonpolicymaking employee. *Burns* at 427 US 368.

Additionally, as we have noted above, if plaintiff is determined to be a policymaking employee, the *Pickering* balancing test must be utilized; that being, of course, balancing plaintiff's First Amendment rights against the vital and legitimate interests, if any, of his public employer.

Because the case is so strong that plaintiff is being injured because of the deprivation of his constitutional rights, we will grant plaintiff relief by requiring that the trial judge issue a temporary injunction ordering that from the release date of this opinion plaintiff should receive from the county on each regular period his salary and all other benefits which he enjoyed in his position as of the date of his discharge until a full hearing can be held and a decision reached in line with the principles hereinabove outlined. See GCR 1963, 820.1(7). The trial judge will also immediately determine if plaintiff is presently engaged in alternative employment as a result of his discharge. If so, the compensation to be paid to plaintiff by reason of the trial judge's order shall be reduced to reflect his actual economic loss. Finally, plaintiff's request for other relief must be determined in conformity with the trial judge's final decision.

Accordingly, this case is remanded for proceedings in conformity with this opinion. We retain no further jurisdiction.

APPENDIX A

We think it unnecessary to reproduce every letter written by the plaintiff; instead we will reproduce two to give a flavor of plaintiff's writing:

"Why are defeated Macomb County Commissioners traditionally kept in the system by their collegaues [sic] with appointments to various commissions such as road, planning and parks and recreation?

"Why are ex-commissioners, ex-supervisors (under the old governmental structure) and other members of 'Macomb's political family' appointed as department heads, deputy directors and board members with little, if any, professional qualifications for these important county positions?

"Why do only the political departments get the necessary resources to help accomplish their goals?

"Why are successful, positive programs transferred from one department to another if not for past or future political favors?

"Why do so many county officials operate from a manual based on preference and discrimination whether this involves the unseen deals made in the selection process for a new Chairman of the Board of Commissioners or the favoritism shown annually in who gets hired during summer employment programs?

"County officials, both elected and appointed, must become more responsible and concerned about the conduct of Macomb County government and the nearly 700,000 citizens who are dependent upon their judgment.

"I hope the new Board of Commissioners will use its political pressure for the positive program-

ming necessary to solve our local problems, not add to them.

                    JOHN PILAROWSKI
                    Mount Clemens"

---

"I would like to compliment Wondering County Employe, the author of 'No Contract Yet' which appeared in The Macomb Daily letters column on April 19, if I knew who to compliment. It is a shame that a county employe [sic] cannot write a letter-to-the-editor expressing his-her beliefs and sign that letter without fear of official reprimand and job harrassment [sic].

"The writer is accurate in the assessment of labor-relations in Macomb County. Commissioner Robert VerKuilen, as chairman of the board, bears responsibility for contract talks not being in a productive stage at this late date. One hundred and twenty-five days without contracts for 32 bargaining groups is ridiculous, yet the employer (Macomb County) is content with this arrangement. Why? Non-movement is not permitted in the private sector nor should it be allowed in the public. Progress cannot be made without communication. To date communication has not occurred, let alone wage offers.

"What is more important resource for a public service organization (county government) than its employees? If the Board of Commissioners will not enter into meaningful discussions (in good faith) with its employees, how can it serve its citizens? Whose interest is met by such delays? Are the funds for employees not already in the county budget? Is this fair treatment, proper leadership or responsive government?

"This anti-union behavior by the commissioners is difficult to understand. Employees are not ene-

mies to be defeated. They are workers with whom to solve problems. Positive labor philosophies must be developed.

JOHN PILAROWSKI
Mount Clemens"

APPENDIX B
49329 AuLac Drive East
Mt. Clemens, Michigan 48043
July 20, 1976

Robert A. VerKuilen, Chairman
Macomb County Board of Commissioners
County Building
Mount Clemens, Michigan 48043
Dear Mr. VerKuilen:

I was disappointed to read in *The Detroit News* (June 28, 1976) that seven county officials, including two "lame duck" commissioners, Mr. Walsh and Mr. Gavin, attended the National Association of Counties (NAC) convention in Salt Lake City. This $2,700.00 junket, all at public expense, as with the trip to Hawaii last year, cannot be understood. This is especially true as we listen to commissioners tell the public and their employees that they are totally committed to a "tight, austere budget" and that cuts will have to be instituted. The commissioners want the best of both worlds, that is, money for all their purposes, but none to settle 27 outstanding labor contracts. The employees, the majority of whom earn $5,828.00 to $8,584.00 a year, are 200 days without contracts. Their patience is to be commended, but how long can these employees wait? Mr. Carter stated in his acceptance speech—invest in people, not buildings and bureaucracy. If commissioners want increased federal funding, it will not be found in Salt Lake City or Hawaii. Public resources must be distributed more productively and in a much less politically self-serving manner.

The five bargaining units who are currently in various stages of ratification (They represent approximately 120 or 8% of a county work force of

1700.) have done so because of a verbal "Me Too Raise Clause" on any agreement signed that exceeds the 5.5% and 4.5% for 1976 and 1977 they received. The county's logic and tactics are apparent, but the short sighted wisdom of dividing to conquer does not address an inequitable salary structure that has existed for years. To intimidate and force employees to break the law by striking in order to receive a living wage is not a public service.

On a second point, I question the Board's reasoning on its recent appointment to the Zoccola seat. You stated you wanted a non-candidate for this seat, however you failed to use this argument when Vander Putten was appointed to Gaberty's commission seat. Mr. Denny L. Robinson's charges of "political hacks" and "machine politics" are perhaps credible statements. Is it sound judgment for a public employee to be appointed to a commissioner seat? The dual role as both a public employee and an appointed county commissioner raises questions. If this reasoning stands, will public employees be allowed appointments to the ethics committee, when formed?

On a third matter, it has been over 30 days since County Commissioner Stephan Dane was indicted on two counts of perjury by a Federal Grand Jury and released on a $5,000.00 personal bond. However, to date, he has not submitted his resignation. Will the Board formally request his resignation, offer another "Vote of Confidence" or officially submit this issue as the first matter of public business for the new ethics commission?

The future must bring the citizens of Macomb County and the nation officials who will speak for the people not against them, possessing integrity, professionalism and who will be fair on the issues

—officials who will exercise objective oversight to correct abuses within the organizational structure of government (for example, Road Commissioners' irregularities). Renewed public faith in the system will have to be earned. We require officials with the ethical convictions, courage and the ability to direct, analize [sic] and implement policy. We can no longer afford to have politicians serving only their own self-interest or obeying the dictates of special political interest groups. All unethical and illegal activities must be rejected and prosecuted under law. It is the people who should run this government. The government should not run the people.

I believe increased public awareness by exposure to who is getting what, when, where, and how will improve the quality of government by improving the character and composition of the membership itself. Informed voters can and must reclaim government and demand political and campaign reform making government responsive to the people as intended by the Constitution. The major gap between the ruling politician and the general population must be closed as the system is opened. This is the way to celebrate our 200th birthday and would hold the greatest promise of another 200 years. The public concern and "fireworks" must not end on the 4th of July, but continue to August 3rd, November 2nd and through our third century. The people responded in 1776 to the political injustices of their day, so must the people of 1976.

More than a time of celebration, this is a time of rededication of ourselves to basic human principals. This nation and especially Macomb County

requires *equality for all and privilege for none* (B. Jordon).

Sincerely,

John M. Pilarowski

cc: Lou Gordon