Carl JOHNSON, M.D.,
Plaintiff-Appellant,

v.

JEFFERSON COUNTY BOARD OF
HEALTH, Otto Bebber and Richard
Newman, Individually and as Members
of the Board of Health, Walt Brown, as
Acting Director of the Jefferson County
Board of Health, Defendants-Appellees.

No. 81SA478.

Supreme Court of Colorado,
En Banc.

April 18, 1983.

John R. Holland, Denver, for plaintiff-appellant.

Stephen W. Miller, Golden, for defendants-appellees Jefferson County Bd. of Health and Walt Brown, Acting Director.

Bradley, Campbell & Carney, Beverly Fulton, Victor F. Boog, Golden, for defendants-appellees Otto Bebber and Richard Newman, Individually.

QUINN, Justice.

Doctor Carl Johnson, former Jefferson County Public Health Officer, filed a complaint in the Jefferson County District Court against the Jefferson County Board of Health (board), two individual members of the board, and the acting director of the Jefferson County Health Department. Johnson sought various forms of relief including a temporary injunction ordering his reinstatement to his former position pending trial on the merits.[1] Among other assertions, Johnson claimed the board discharged him without complying with the procedural requirements of the Jefferson County personnel rules, and in unlawful retaliation for activities protected by the First Amendment guarantee of free speech, *U.S. Const.*Amends. I and XIV. The court refused to grant a temporary injunction, and Johnson brought this appeal pursuant to C.A.R. 1(a)(3). Although we agree with the trial court's ruling that the personnel rules did not apply to the discharge of a public health officer, who by statute serves at the pleasure of the county board of health, section 25–1–505(1), C.R.S.1973 (1982 Repl.Vol. 11), we conclude that the trial court failed to apply appropriate constitutional standards in assessing Johnson's request for injunctive relief in connection with his free speech claim. We therefore vacate the judgment and remand to the trial court for further proceedings.[2]

I.

On June 20, 1973, Johnson was appointed Jefferson County Public Health Officer, effective September 1, 1973, to serve at the pleasure of the board. In December of 1974 Johnson received an inquiry from a county commissioner relating to the safety of re-

1. Johnson named as defendants the Jefferson County Board of Health, individual board members Otto Bebber and Richard Newman, and Walt Brown, the acting director of the Jefferson County Department of Health. Johnson's claim against Brown appears to be restricted to prohibitory and injunctive relief in relation to his role as acting director. The other defendants, the Jefferson County Board of Health and board members Bebber and Newman, are named defendants in all of Johnson's claims. *See* note 4, *infra.* Throughout this opinion we will refer to the defendants collectively as "the board."

2. Because we vacate the judgment and remand for further proceedings, it is unnecessary for us to address Johnson's two other contentions. First, he claims that the board violated due process of law, *U.S. Const.*Amend. XIV, by not affording him procedural protections in relation to his discharge. Admittedly, Johnson was a nontenured employee serving at the pleasure of the board and, as such, had no "liberty" or "property" right to continued employment. Without any entitlement to continued employment, Johnson had no per se right to a pretermination hearing. However, in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the United States Supreme Court indicated that due process considerations might apply if the government, in dismissing or refusing to rehire an employee, made charges tending to damage his "good name, reputation, honor, or integrity." *Id.* at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558, quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515, 519 (1971). Whether such charges are present here, we do not decide at this time. If the trial court upon remand decides in Johnson's favor on his free speech claim, his due process claim to a pretermination hearing will be moot.

Johnson's second contention, which we do not address, is that the board's decision to terminate him was made at a closed meeting conducted in violation of the Colorado Public Meetings Law, section 29–9–101, C.R.S.1973 (1978 Repl.Vol. 12 and 1982 Supp.). The trial court made virtually no findings on this claim, and it also could be rendered moot after further proceedings in this case.

zoning for residential use a parcel of farm land located near the Rocky Flats Plant, a facility in Jefferson County engaged in the production of nuclear weaponry. After consulting several local experts, Johnson advised the commissioner that radiation levels in the area exceeded related state guidelines and that he believed there might indeed be a safety hazard. The rezoning request was denied.

The commissioner's inquiry sparked various research efforts on the part of Johnson relating to possible health hazards generated by the Rocky Flats Plant. His endeavors included a survey of radiation levels in areas surrounding the plant, the development of a new method of measuring levels of plutonium contamination, advocacy of strict state standards defining the maximum "safe" levels of radiation, and the study of differential cancer rates. Funding sources for his research efforts included not only Jefferson County, but also the National Institute of Health. Some of Johnson's conclusions were quite alarming. Johnson, for example, uncovered evidence which, in his opinion, disclosed that in 1957 an explosion and fire took place at the plant which blew out hundreds of industrial filters and released large amounts of plutonium, an event which he claimed was largely unreported. His study of local cancer rates led him to conclude that radiation from the plant had caused an excess rate of 24% in males and 10% in females for all types of cancer. His studies and findings received considerable attention, and, typically with advance board approval, he traveled nationally and internationally to attend and address various scientific conferences.

Throughout his tenure as public health officer Johnson reported the results of his studies to the board. A majority of the five member board consistently approved continued studies of the health hazards generated by the Rocky Flats Plant and evaluated Johnson's job performance as above average to outstanding. In contrast, however, board chairman Otto Bebber was highly critical of Johnson. He ranked Johnson as an average or unsatisfactory public health officer. Bebber, recommending that Johnson should place greater focus on epidemiological concerns, criticized him for frequent absences, for his calling of press conferences, and for meddling in plutonium and uranium evaluations in areas other than Jefferson County. On two occasions Bebber, without board authorization, took it upon himself to curtail Johnson's activities. In January of 1976 he prohibited Johnson from attending a pending meeting of the Colorado Land Use Commission. In April of the following year he advised a news reporter that Johnson would be publicly censured for giving an interview detailing some of his findings. In each of these instances the majority of the board disagreed with Bebber's actions, and on the latter occasion the board passed a resolution expressing support for Johnson's studies.

On May 31, 1979, the board adopted recently drafted county personnel rules, effective March 15, 1980. These rules permitted a board to dismiss an employee by giving to the employee a written notice of intent to dismiss which contained the reasons for the dismissal. The rules provided that the dismissal would become final three working days following the delivery of the notice of intent to dismiss, unless the employee invoked a grievance procedure established by the rules. See Jefferson County, Co., Personnel Rule XI(B)(3) (1980).

Beginning in late 1980, several high level employees of the Jefferson County Health Department submitted resignations. In December of that year Walter Brown, the administrative assistant of the department, informed the board of his intent to retire on May 31, 1981. The following month Dan Tipton, the director of the environmental health division, informed the board that he was resigning and moving to Maine, where his wife had secured employment. Also, in April of 1981 Doris McCoy, the director of nursing, informed the board of her intent to resign, citing as her reason a desire for a change in careers. On April 17, 1981, some board members met in executive session in order to discuss their concerns about Johnson and the health department. It is not clear from the record which board mem-

bers, in addition to chairman Bebber, attended this meeting. Chairman Bebber related to the other members that Tipton had confided to him that the true reason for his resignation was an inability to work and communicate with Johnson. Doris McCoy, who was also present, told the board members that her resignation was due to Johnson's lack of leadership and lack of support for her efforts. The board members were of the view that Bebber should tell Johnson to look for other employment. Bebber later met with Johnson and, according to Johnson, told him that the board members were insisting on his ouster due to his Rocky Flats studies.

In May of 1981 Charles DeShazer assumed office as a new member of the board.[3] On May 15 the full board met and again discussed Johnson. In executive session the board heard from Doris McCoy, the director of nursing, who described numerous problems she perceived in Johnson's administrative abilities. In her opinion he was a "one issue director" who had no real interest in or understanding of routine health department programs and concerns. At the conclusion of the executive session the meeting was opened to the public. At the opening of the meeting Chairman Bebber invited a motion to dismiss Johnson as public health officer. Johnson stated "I'd rather resign than be dismissed" and requested an opportunity to resign in order to retain accrued employee benefits. His request was accepted by the board in a three

to one vote, with one abstention. Three days later Johnson submitted his written resignation to the board.

On June 11, 1981, Johnson filed a complaint under C.R.C.P. 106(a)(4) and later amended his complaint to encompass a variety of theories including injunctive and declaratory relief, money damages, and punitive damages.[4] He initially sought a temporary injunction ordering the board to reinstate him pending the trial of the case. An extensive hearing was held on Johnson's motion. During the hearing a wealth of evidence was presented detailing not only the course of events culminating in what Johnson characterizes as "his constructive discharge," but also the scientific merit of Johnson's studies and the possible motivations of the three board members who voted to accept his resignation.

Johnson contended that the board action was generated by concerns that his studies would damage property values and development potential in the areas surrounding the Rocky Flats Plant and that the alleged administrative deficiencies were a mere pretext for his removal. He presented evidence that Bebber had at one time owned property near the Rocky Flats Plant and had repeatedly expressed concerns about maintaining the area's property values.[5] Similarly, according to Johnson's testimony, board member Richard Newman voted to accept the resignation because Johnson had initiated an investigation by the United States Environmental Protection Agency of

---

**3.** Although board member DeShazer assumed office sometime in May 1981, he was present at the executive session on April 17, 1981, when it was decided that Bebber should tell Johnson to resign.

**4.** Johnson originally filed a complaint seeking prohibitory relief under C.R.C.P. 106(a)(4). On July 2, 1981, prior to the filing of a responsive pleading, he amended his complaint and added claims for declaratory and injunctive relief as well as the following: a claim that the action of the board violated his civil rights under 42 U.S.C. § 1983; a claim that board members Bebber and Newman should have disqualified themselves from consideration of his discharge because they labored under a conflict of interest by reason of owning property in the Rocky Flats area; claims that his discharge by the

board constituted an abusive discharge, outrageous conduct, and negligent infliction of emotional distress; and a claim for breach of his employment contract against the board and board members Bebber and Newman. In addition to injunctive relief, Johnson sought compensatory and money damages on his civil rights claim, as well as his tort and contract claims. We consider in this opinion only Johnson's request for a temporary injunction pending trial on the merits of his various claims.

**5.** The trial court expressly found that Bebber had sold his property in the Rocky Flats area prior to the actions of the board in April and May of 1981 and that, therefore, he did not labor under any conflict of interest in voting for Johnson's discharge.

several plants located in the Rocky Flats Industrial Park including one in which Newman had an ownership interest.[6] There was also evidence that the third board member voting for Johnson's ouster, Charles DeShazer, had only just taken office and had never met him.

Johnson was not alone in his view of the board's action. Fredric Jacobus, who was the predecessor of board member DeShazer, testified that the allegations of poor administration were "mere smokescreens for an unjustifiable and personal attack on this man's integrity, professionalism and legitimate public health activities, particularly for his Rocky Flats investigations." This view was shared by Marcia Walsh, the board member who voted against accepting Johnson's resignation. She testified that Johnson was terminated "because of his studies of Rocky Flats."

The board presented evidence questioning Johnson's administrative capabilities. Johnson's secretary, Genie Wood, testified that Johnson was away from the office approximately half of the time and that he had spent the majority of his time on Rocky Flats related activities. Doris McCoy testified to the complaints she made to the board at its April and May meetings as well as her general view that Johnson overemphasized radiation studies at the cost of other health department functions. Dan Tipton, the former director of the environmental division of the department, expressed a similar sentiment. In his view Johnson's style was that of an "alarmist" who would immediately seize on any tentative health hazard and publicize it. This trait, according to Tipton, resulted in distrust on the part of other state agencies which normally were consulted about potential health hazards before the hazards were publicized, and also resulted in low employee morale because of Johnson's apparent lack of concern for day to day activities.

At the conclusion of the hearing the court denied the request for a temporary injunction, concluding that there was no substantial likelihood that Johnson would succeed on the merits of his complaint. In the court's view section 25–1–505(1), C.R.S.1973 (1982 Repl.Vol. 11), which provides that a public health officer shall "serve at the pleasure of the board," rendered the county personnel rules inapplicable to Johnson as the county public health officer; and therefore it rejected his claim that the board action was invalid due to its failure to comply with the county personnel rules. With respect to Johnson's claim that his forced resignation or dismissal was a retaliation against constitutionally protected activity in violation of his civil rights, 42 U.S.C. § 1983, the court made the following findings: that throughout Johnson's tenure his studies of radiation hazards emanating from the Rocky Flats Plant were conducted with the approval of a three to two majority of the board; that Johnson was not "gagged" at any time by the board; that board member DeShazer voted for Johnson's discharge because the Rocky Flats investigation "had gone far enough" and could better be pursued by federal and state agencies, and also because Johnson had a belligerent attitude; that the testimony of the health department employees Brown, Tipton and McCoy about Johnson's poor administrative abilities provided "a justifiable reason for Dr. Newman to vote for the termination of [Johnson's] employment;" that during Johnson's tenure board member Bebber did not agree with the board majority's approval of the Rocky Flats Plant and radiation studies, but instead "wanted to change the direction of the [department];" and that the votes cast by these three members indicate their belief as of April and May 1981 that Johnson "could not adequately direct the department in the direction they wished it to go." Based on these findings the court concluded that "the dismissal of [Johnson] was not unjustified,

6. The court found that Johnson's charge of conflict of interest against board member Newman was "created by [Johnson] at the meeting at the Environmental Protection Agency after he was advised that the Board intended to terminate his employment."

was not arbitrary and was not capricious."[7] Johnson's motion for a new trial was denied, and the parties stipulated in writing that the order denying the temporary injunction should serve as the final judgment in the case. The court approved the stipulation and certified the case for appellate review.

 The purpose of injunctive relief is to preserve the status quo pending trial on the merits. A decision on a request for a temporary injunction requires a weighing of several factors including, *inter alia:* the significance of the legal interest entitled to protection; the likelihood of real and irreparable injury to these interests if injunctive relief is denied; the probability of success on the merits at trial by the party seeking injunctive relief; and the effect of the injunction on the public interest. *See gener-*

ally *Littlehorn v. Stratford,* 653 P.2d 1139 (Colo.1982); *Rathke v. MacFarlane,* 648 P.2d 648 (Colo.1982); *Johnson v. District Court,* 195 Colo. 169, 576 P.2d 167 (1978); Leubsdorf, *The Standard For Preliminary Injunctions,* 91 Harv.L.Rev. 525 (1978). A request for a temporary injunction necessarily involves a consideration of the substantive law applicable to the trial on the merits, and it is within this substantive framework that Johnson's claims must be evaluated.

### II.

Before addressing Johnson's free speech claim, we first consider whether the Jefferson County personnel rules were applicable to him as public health officer. Personnel Rule XI(B)(3) requires advance notice of an intent to dismiss and the reasons therefor,[8]

---

7. The court's bench ruling on Johnson's First Amendment claim was as follows:

"The Court finds that attempts were made by the minority of the Board throughout Dr. Johnson's tenure as the Public Health Officer to limit his investigation of the Rocky Flats and resulting radiation studies, but these attempts were never successful.

"The Court further finds that the Plaintiff acted with authority of the Board throughout its tenure and further, that there was a consistent 2 to 3 vote, minority vote, against the Plaintiff's activity in the study of radiation.

"The Court further finds that both the majority and minority of the Board's interpretation of the statute concerning the role of the County Health Department in radiation studies [was] justified. It cannot be said throughout the tenure of the Plaintiff, and the Court so finds, that he was gagged at any time."

\* \* \* \* \* \*

"The Court further finds that Dr. Bebber did not agree with the majority of the Board, or the Plaintiff, in their continued pursuit of the radiation investigation and that he wanted to change the direction of the Dept. of Health.

"The Court further finds that this was no secret to the Plaintiff or the majority members of the Board of Health throughout the entire tenure of Dr. Johnson.

"The Court further finds from the testimony of Mrs. McCoy, Mr. Tipton and Mrs. Wood that the primary reason for McCoy and Tipton's resignation was the poor administrative ability of the Plaintiff, and that there was a justifiable reason for Dr. Newman to vote for the termination of the Plaintiff's employment."

\* \* \* \* \* \*

"The Court further finds that Mr. DeShazer's reason for voting for the termination of the Plaintiff's employment was 1: that the Rocky Flats investigation had gone far enough by the County Health Department and that there are other federal and state agencies who are better equipped to continue the investigation; and 2, that the Plaintiff had a belligerent attitude towards the Board.

"The Court finds that these reasons, although not as defensive as Dr. Bebber's and Mr. Newman's, were not arbitrary and capricious and not beyond the authority of the Board members."

\* \* \* \* \* \*

"It is obvious from the vote of the majority of the Board in the months of April and May of 1981 that they believed that the Plaintiff could not adequately direct the department in the direction they wished to go.

"Therefore, the dismissal of the Plaintiff was not unjustified, was not arbitrary and was not capricious.

"It is, therefore, ordered that the Petition of the Plaintiff for injunctive relief be and is hereby denied."

8. Rule XI(B)(3) states:

"The appropriate Elected Official, Board Administrative Supervisor or Department Head may dismiss an employee by giving to the employee a written notice of intent to dismiss, setting forth the reasons therefor. Dismissal shall become final within 3 working days of notice of intent to dismiss, unless the employee invokes the grievance procedure." Jefferson County, Co., Personnel Rule XI(B)(3) (1980).

and Rule XII creates hearing procedures for employees who receive a notice of dismissal. Section 25–1–505(1), C.R.S.1973 (1978 Repl.Vol. 11), on the other hand, provides that a county public health officer "shall be appointed by the board to serve at the pleasure of the board." The issue presented here is whether the board was limited in its statutory power to terminate Johnson's employment by reason of the restrictions contained in the county personnel rules. We hold that it was not.

■ The general rule is that a local government may not forbid that which the state has explicitly authorized. *See* 1 C. Antieau, *Municipal Corporation Law* § 5.37 (1983). As this court stated in *County Commissioners v. Love,* 172 Colo. 121, 125, 470 P.2d 861, 862 (1980):

"A county is not an independent governmental entity existing by reason of any inherent sovereign authority of its residents; rather, it is a political subdivision of the state, existing only for the convenient administration of the state government, created to carry out the will of the state.... As a political subdivision, a county, and its commissioners, possess only such powers as are expressly conferred upon them by the constitution and statutes, and such incidental implied powers as are reasonably necessary to carry out such express powers."

■ An employee who serves "at the pleasure" of his employer generally may be discharged at any time without cause or formal procedure. *See People v. Horan,* 192 Colo. 144, 556 P.2d 1217 (1976), *cert. denied,* 431 U.S. 966, 97 S.Ct. 2922, 53 L.Ed.2d 1061 (1977); 4 E. McQuillin, *The Law of Municipal Corporations* § 12.229b (3d ed. 1979 rev. vol.). The legislature in section 25–1–505 has expressed its judgment that this same degree of authority

should apply to county boards of health in relation to public health officers. The county board of health has the responsibility of determining "general policies to be followed by the public health officer in administering and enforcing the public health laws, the orders, rules, and regulations of the board, and the orders, rules, regulations, and standards of the state board of health." Section 25–1–507(1)(b), C.R.S.1973 (1982 Repl.Vol. 11). This responsibility, in the legislature's view, justifies a reciprocal authority in the board to provide for the effective implementation of its policies at the administrative or delivery level of the county's public health program. The board's power to discharge at will the public health officer, who by statute is the administrative and executive head of the county health department, section 25–1–505(1), C.R.S.1973 (1982 Repl.Vol. 11), assures that changing policies and priorities of the board may be immediately implemented, if necessary, by replacement of the person who is clearly responsible for their implementation. We conclude, therefore, that the Jefferson County personnel rules, even though adopted by the board of health, do not override the explicit statutory authority of the board to discharge a public health officer appointed by the board.[9] A county board of health, as a political subdivision of the state, may not by rule or regulation abdicate the authority and responsibility delegated to it by the legislature. *See Carter v. City of Durango,* 16 Colo. 534, 27 P. 1057 (1891); *Hackler v. Ward,* 105 Cal.App.2d 615, 234 P.2d 170 (1951); *Parsons v. Breed,* 126 Ky. 759, 104 S.W. 766 (1907); *Potts v. Morehouse Parish School Board,* 177 La. 1103, 150 So. 290 (1933); *Jensen v. School District,* 160 Minn. 233, 199 N.W. 911 (1924); *DeSantis v. City of Troy,* 83 Misc.2d 195, 371 N.Y.S.2d 310 (1975); *Kinsland v. Mackey,* 217 N.C. 508, 8 S.E.2d 598 (1940).

9. The board, in our view, did not actually intend the county public health officer to be included within the grievance procedures of the county personnel rules. The rules were adopted on June 1, 1977, with an effective date of August 16, 1977. On August 11, 1977, before the personnel rules became effective, the board adopted a bylaw which expressly provided that the public health officer shall serve at the pleasure of the board. This bylaw, basically a restatement of section 25–1–505(1), C.R.S.1973 (1982 Repl.Vol. 11), is clearly inconsistent with the notion that the board believed that its authority to dismiss the county health officer was somehow limited by the personnel rules.

### III.

Although we hold that Johnson was subject to discharge "at the pleasure of the board," section 25–1–505(1), C.R.S.1973 (1982 Repl.Vol. 11), this does not mean that the board's discretion was limitless. It is well established that even where a government employer may discharge an employee for no reason whatsoever, it nevertheless may not discharge that employee in retaliation for the exercise of his free speech rights. If the government could deny a benefit to a person solely because of the exercise of constitutionally protected speech, the exercise of that freedom would in effect be penalized and inhibited. "This would allow the government to 'produce a result which [it] could not command directly.'" Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570, 577 (1972), quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460, 1473 (1958). Such an abridgement is constitutionally impermissible. Perry v. Sindermann, supra; Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

In Mt. Healthy City School District v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the United States Supreme Court developed a three-part analysis in determining whether the termination of a governmental employee constitutes an unlawful retaliation for the exercise of First Amendment rights. The initial consideration is whether the employee's activities fall within the protection of the constitutional guarantee of freedom of speech. If they do, the next inquiry is whether the employee establishes that these activities were a substantial or motivating factor in the decision to terminate his employment. Finally, if the preceding question is answered affirmatively, it must be determined whether the governmental employer would have discharged the employee for reasons unrelated to constitutionally protected activities.

The three-part analysis developed in Mt. Healthy was reaffirmed by the Supreme Court in Givhan v. Western Line Consoli-

dated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), and more recently was applied by this court in Durango School District No. 9–R v. Thorpe, 200 Colo. 268, 614 P.2d 880 (1980). The trial court's findings in this case do not reflect the application of the three-part test of Mt. Healthy in resolving the propriety of injunctive relief in relation to Johnson's free speech claim. For this reason the judgment must be reversed and the cause remanded for a new trial. We will proceed in due course to examine each aspect of the Mt. Healthy standard so as to illuminate the factors which the trial court should consider upon remand.

Before proceeding to our analysis, however, we put to rest any notion that Johnson's free speech claim is somehow diminished by the fact that he was not formally discharged by the board but, instead, tendered his resignation. The board does not dispute Johnson's assertion that his resignation was precipitated by the threat of dismissal. Under these circumstances we view his resignation as the substantive equivalent of a refusal to rehire by the board. See, e.g., Mt. Healthy City School District v. Doyle, supra; Perry v. Sindermann, supra; Durango School District No. 9–R v. Thorpe, supra. In short, it is the threat of dismissal from public employment, allegedly made in retaliation for the exercise of an employee's free speech rights, that renders the employee's claim cognizable.

### A.

The first prong of the Mt. Healthy test addresses the question whether particular conduct of a governmental employee is protected by the First Amendment. The burden is upon the employee as claimant to prove his conduct in question was a form of constitutionally protected expression. In the context of this case Mt. Healthy requires the trial court to determine whether Johnson proved by a preponderance of evidence that his studies, publications, and speeches on the health hazards emanating from the Rocky Flats Plant were a form of

constitutionally protected expression under the First Amendment.

■■ While there seemingly would be no doubt that such activities on the part of a nongovernmental employee would be considered "speech" within the meaning of the First Amendment, "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education, supra* 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817. Governmental employees, by virtue of their position, engage in activities that affect the daily lives of private citizens. Speech and other forms of conduct by these employees under certain circumstances can jeopardize the effective operation of the governmental activity. Because the government has a significant interest in maintaining efficiency in its operations, the Supreme Court has recognized the appropriateness of a balancing test in resolving the employee's claim of governmental retaliation for the exercise of First Amendment rights. What must be balanced, on the one hand, is the interest of the employee in commenting upon matters of public concern and, on the other, the interest of the governmental employer in maintaining efficiency in its delivery of services. *See Pickering v. Board of Education, id.* at 568, 88 S.Ct. at 1734–35, 20 L.Ed.2d at 817.

■■ In striking a proper balance a distinction must be made between nonpolicymaking and policymaking employees. The free speech interest of most governmental employees generally will be substantial enough to prohibit discharge or termination solely because of the employee's exercise of First Amendment rights on a matter of public interest. *See Pickering v. Board of Education, supra.*[10] The constitutional balance weighs more heavily in favor of the governmental interest in efficient operations, however, in the case of policymaking employees. This policymaking-nonpolicymaking distinction, which was developed in the context of free political association, is designed to ensure that representative government will not be undercut by public statements which obstruct the implementation of goals and priorities set by political officials, whether elected or appointed, who are ultimately responsible for the governmental service. *See Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547, 562 (1976).[11] Although no

10. The Supreme Court in *Pickering,* however, implicitly acknowledged that a governmental employee may be discharged where the employee makes false public statements critical of a superior and the statements are shown to have been made with the employee's knowledge of or with reckless disregard of their falsity. *Id.* at 573–74, 88 S.Ct. at 1737–38, 20 L.Ed.2d at 820–21. So also, as *Pickering* recognized, public statements made by an employee may furnish an independent basis for discharge or termination when they undermine the "effectiveness of the working relationship," *id.* at 570, note 3, 88 S.Ct. at 1735, note 3, 20 L.Ed.2d at 818, note 3, or substantially affect such governmental interests as employee competency, administrative efficiency, or coworker harmony. *See generally,* Note, *The Nonpartisan Freedom of Expression of Public Employees,* 76 Mich.L.Rev. 365 (1977).

11. In *Elrod* the United States Supreme Court held that nonpolicymaking employees of the county sheriff's office could not be discharged, following an election ousting the incumbent sheriff and his political party, solely because they were not affiliated with a particular political party. The plurality opinion of Justice Brennan, joined by Justices White and Marshall, recognizes that harmonious work relations are likely to be undermined when the executive's policy is publicly criticized by a subordinate. In addition, governmental efficiency may well be destroyed if policymakers themselves are in disagreement on priorities or goals. This led Justice Brennan to indicate in dicta that policymakers could be subjected to patronage discharges solely on the ground of their party affiliation.

There is no indication in this case, however, that Johnson's discharge was related to his political affiliation or was precipitated by changes in the composition of the county government based upon partisan political decisions of elected officials. Nor do we believe that it can plausibly be argued that the *Elrod* dicta, which implies that a patronage dismissal of a policymaking employee after a partisan election would not run afoul of the employee's First Amendment political association rights, should be extended to a nonpartisan discharge alleged to be in retaliation for free speech. The primary purpose of partisan political associa-

bright line can be drawn between policy and nonpolicymaking positions, it has been stated that a nonpolicymaking employee will generally have fixed and routine responsibilities, with no voice in the setting of goals and priorities for the governmental operation. *Id.* A policymaking employee, on the other hand, will usually have responsibilities that "are of broad scope," frequently acting as an advisor to the person ultimately responsible for the particular governmental agency and playing an important role in the development of goals and priorities. *Id.* at 368, 96 S.Ct. at 2687, 49 L.Ed.2d at 562.

 Resolving the question of whether the employee was a policymaking employee does not, however, exhaust the constitutional analysis of whether the speech activity was constitutionally protected. "The First Amendment forbids abridgement of the 'freedom of speech.'" *Givhan v. Western Line Consolidated School District, supra,* 439 U.S. at 415, 99 S.Ct. at 696, 58 L.Ed.2d at 625. The role the policymaking distinction plays in First Amendment doctrine is simply to heighten the employee's burden of establishing that any infringement on the efficiency of governmental functions is outweighed by the employee's interest in commenting on matters of public concern. The United States Supreme Court in *Pickering v. Board of Education, supra,* acknowledged that the negative impact upon governmental functions may very well be more severe where the speech activity is that of a policymaking employee. This is so because policymaking

positions often involve a relationship with a superior that is of "such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." *Pickering v. Board of Education, supra* 391 U.S. at 570, note 3, 88 S.Ct. at 1735, note 3, 20 L.Ed.2d at 818, note 3. Thus, the governmental interest in maintaining loyalty and effectiveness on the part of a policymaking employee may be more substantial than in the case of a nonpolicymaking employee, *see Gould v. Walker,* 356 F.Supp. 421 (N.D.Ill.1973); *Bennett v. Thomson,* 116 N.H. 453, 363 A.2d 187 (1976), *appeal dismissed,* 429 U.S. 1082, 97 S.Ct. 1086, 51 L.Ed.2d 528 (1977), as is the governmental interest in removing policymaking employees whose expressions indicate an unwillingness to implement governmental policies, *see Megill v. Board of Regents,* 541 F.2d 1073 (5th Cir.1976); *Smith v. United States,* 502 F.2d 512 (5th Cir.1974); *Bean v. Darr,* 354 F.Supp. 1157 (M.D.N.C.1973). Viewed in this context, it becomes apparent that the public statements of a policymaking employee may be a basis for dismissal or discharge when the statements are such as to materially undermine the overriding governmental interest in the effective administration of its programs. *See Hostrop v. Board of Junior College District No. 515,* 471 F.2d 488 (7th Cir.1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973); *Sprague v. Fitzpatrick,* 412 F.Supp. 910 (E.D.Pa.1976), *aff'd,* 546 F.2d 560 (3d Cir.1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Muir v. County*

---

tion is to effect political change through the removal of the incumbent officeholder. This purpose, however, can hardly be realized where the policymaking staff members of the ousted administration are entitled to retain their positions. In this sense, therefore, authorizing patronage dismissals following a partisan election is consistent with the interests underlying the constitutional right of political association. The primary purpose of free speech respecting matters of public concern, by contrast, is to communicate important information to the public, usually without regard to the effect of the information on partisan politics. Authorizing dismissals taken in retaliation for such speech not only fails to serve a related

interest underlying the constitutional right of free speech, but deters the exercise of the right itself. Therefore the balance struck in the plurality *Elrod* dicta cannot blindly be carried forward to the distinct constitutional protection at issue here. Rather, as developed in the text, even the policymaking employee's speech is entitled to constitutional protection absent a material impact upon the efficiency of governmental operation. Activity involving pure speech has always assumed a high position in the hierarchy of First Amendment interests especially where, as here, the activity consists of public statements on matters of public concern. *See New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

*Council,* 393 F.Supp. 915 (D.Del.1975); *Leslie v. Philadelphia 1976 Bicentennial Corporation,* 343 F.Supp. 768 (E.D.Pa.1972), aff'd, 478 F.2d 1398 (3d Cir.1973); *Pilarowski v. Brown,* 76 Mich.App. 666, 257 N.W.2d 211 (1977); *see generally* Coven, *The First Amendment Rights of Policymaking Employees,* 12 Harv.C.R.-C.L.L.Rev. 559 (1977); Note, *The Nonpartisan Freedom of Expression of Public Employees,* 76 Mich.L.Rev. 365 (1977).

▮▮▮▮ Even with the enhanced potential for negative impact which the public statements of a policymaking employee may bear on the efficiency of governmental functions, the policymaking employee may nonetheless demonstrate that the interest in allowing free commentary on a matter of public concern overrides the governmental interest. He may show, for example, that his statements were not such as to likely impair the essential and rightful goals of the governmental office in a material manner. *See, e.g., Tygrett v. Washington,* 543 F.2d 840 (D.C.Cir.1974) (discharge of police officer because of statement of intent to violate departmental rules if police labor dispute unresolved was invalid in the absence of a determination that officer's statement affected his efficiency or that of the police force in rendering service to the community); *Mabey v. Reagan,* 537 F.2d 1036 (9th Cir.1976) (college faculty member's expression before academic senate can justify dismissal only if it substantially and materially disrupted the meeting and his subsequent relations with the administration and faculty); *Smith v. Losee,* 485 F.2d 334 (10th Cir.1973), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974) (state cannot discharge professor for exercise of constitutional rights unless professor's acts materially and substantially interfered with the discipline required in the school's operation); *Dendor v. Board of Fire*

*and Police Commissioners,* 11 Ill.App.3d 582, 297 N.E.2d 316 (1973) (fireman's statement before village trustees in public meeting criticizing his superior not ground for discharge where reviewing board made no finding that expression had an adverse effect on the fire department); *In re Gioglio,* 104 N.J.Super. 88, 248 A.2d 570 (1968) (policeman's critical assessment of the police department in newspaper article not ground for discharge where there was no reason to conclude that publication impaired or disrupted departmental efficiency); *In Re Chalk,* 441 Pa. 376, 272 A.2d 457 (1971) (welfare case worker's public statements to welfare recipients urging them to pressure their case workers and demand rights did not constitute ground for discharge where no showing of any harmful effects of the speech); *Board of Trustees v. Spiegel,* 549 P.2d 1161 (Wyo.1976) (teacher may not be discharged for statements published in connection with union activities unless such statements "disrupted or impaired discipline in the teaching processes and substantially interfered with the requirements and discipline in the operation of the school"). In this respect it is appropriate for the court to consider the public importance of the subject matter of the speech, whether the employee's knowledge and expertise are such as to render his statements of particular value to public debate,[12] the extent to which a retaliatory dismissal might result in a severe limitation of public access to vital information, and whether any transitory detriment to the operations of the governmental agency would likely be outweighed by the long-term enhancement of agency goals which may result from a public airing of the employee's concerns. *See generally* Coven, *The First Amendment Rights of Policymaking Employees,* 12 Harv.C.R.-C.L. L.Rev. 559 (1977); Note, *The Nonpartisan Freedom of Expression of Public Employees,* 76 Mich.L.Rev. 365 (1977).

**12.** Considering the statutory duties imposed upon a county department of health, section 25-1-506, C.R.S.1973 (1982 Repl.Vol. 11), of which the county public health officer is the executive and administrative head, section 25-1-505(1), C.R.S.1973 (1982 Repl.Vol. 11), it is not unreasonable to expect a county health officer, overseeing the operations of a county health department in an area directly contiguous to a facility engaged in the manufacture of nuclear weapons, to have informed opinions, if not scientifically validated information, as to the public health dangers posed by the nuclear facility.

In this case the trial court did not attempt to evaluate the various factors relevant to the First Amendment balance. Instead, the court focused primarily on the fact that Johnson was "not gagged" by the board, and then concluded, without considering the question of the board's actual motivation or other factors pertinent to a resolution of Johnson's request for injunctive relief (see Parts III B and C, infra), that the testimony of several health department employees furnished "a justifiable reason" for the board's decision. Upon remand the trial court must determine initially whether Johnson's Rocky Flats activities were entitled to constitutional protection.[13]

### B.

▬ If upon remand the trial court determines that Johnson's Rocky Flats activities were a form of constitutionally protected expression, it must then proceed to the second prong of the Mt. Healthy analysis and consider whether there was a causal relationship between these activities and the board's decision to require his forced resignation. The burden of proof on the issue of causation is upon Johnson to establish by a preponderance of evidence that his constitutionally protected activities were a substantial or motivating factor in the board's decision. Mt. Healthy City School District v. Doyle, supra; Durango School District No. 9–R v. Thorpe, supra. Resolution of this issue involves a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450, 465 (1977), cited with approval in Mt. Healthy City School District v. Doyle, supra. The following factors, while not exhaustive of the issue, are certainly pertinent: the historical background of the board's decision to terminate Johnson; the causal nexus between Johnson's constitutionally protected activities and the board's decision to terminate; the extent to which the board may have departed from normal procedures or policies in reaching its decision; the pretextual character, if any, of the reasons advanced for termination; and the evidentiary support for the asserted reasons for termination. We point out that a "substantial or motivating" factor need not be the sole, dominant, or primary factor leading to the challenged governmental action. As long as Johnson establishes that his constitutionally protected conduct played an important or significant part in the board's decision, he will have sustained his burden.

The trial court in this case did not apply the requisite standard of causation in resolving Johnson's request for injunctive relief relative to his free speech claim. The court, for example, found that the two reasons for board member DeShazer's vote for Johnson's termination were (1) his belief that "the Rocky Flats investigation had gone far enough" and could be more effectively continued by federal or state agencies, and (2) his opinion that Johnson "had a belligerent attitude towards the Board." There was no evidence, however, that the majority of the board had ordered Johnson to cease from his Rocky Flats investigation. Nor was there any evidence that Johnson's activities were in direct violation of board policy. If DeShazer's vote to terminate Johnson was based in substantial part on Johnson's past Rocky Flats activities, all of which were approved by a majority of the

---

13. This determination will involve, in part, the issue of Johnson's policymaking or nonpolicymaking status. We recognize that section 25–1–507(1), C.R.S.1973 (1982 Repl.Vol. 11), grants the county board of health specific power "[t]o determine general policies to be followed by the public health officer in administering and enforcing the public health laws" and "[t]o act in an advisory capacity to the public health officer on all matters pertaining to public health." Also, section 25–1–508(1)(a) requires the county health officer to administer the "orders, rules, and regulations of the county ... board of health." Although these statutes and others are certainly pertinent to the court's inquiry into whether Johnson did or did not occupy a policymaking position in relation to the board, they are by no means conclusive of the issue. The court must examine the totality of circumstances surrounding Johnson's relationship to the county board of health in resolving this question.

board when those activities were conducted, then Johnson's Rocky Flats activities indeed would have been a substantial or motivating factor in DeShazer's decision.

Similarly, in the case of board member Newman's vote, the court found that there was some evidence of Johnson's poor administrative ability, and from this finding it reasoned that there was "a justifiable reason" for Newman's vote. However, merely because some evidence of Johnson's administrative deficiencies might have provided "a justifiable reason" for Newman's vote is not to say that Newman did indeed vote to terminate Johnson's employment for this reason. The trial court simply failed to address the question whether Johnson's constitutionally protected conduct did or did not play a substantial or motivating role in Newman's vote.

Finally, with respect to Chairman Bebber's vote, the court found that he did not agree with the majority of the board, as previously constituted, and "wanted to change the direction of the Dept. of Health." The trial court expressly noted in its findings that the majority of the board, prior to DeShazer's assumption of office in May 1981, consistently supported Johnson's Rocky Flats studies and his public reporting of the health hazards emanating from the Rocky Flats Plant. It simply does not follow that because Bebber disagreed with the former board's endorsement of Johnson's activities and wanted to change the priorities of the department, Johnson's constitutionally protected conduct would not have been a substantial or motivating factor in Bebber's vote to force his resignation. Because the trial court failed to apply the second prong of the Mt. Healthy analysis it could not properly assess Johnson's request for a temporary injunction predicated on his alleged termination in retaliation for his exercise of First Amendment rights.

C.

Johnson's satisfaction of his burden to prove that his Rocky Flats activities were constitutionally protected and his conduct was a substantial or motivating

factor in the board's decision to terminate him will not end the inquiry. As the Supreme Court observed in Mt. Healthy:

"A rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.... The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision." Mt. Healthy City School District v. Doyle, supra, 429 U.S. at 285–86, 97 S.Ct. at 575, 50 L.Ed.2d at 482–83.

Thus, if Johnson proves the exercise of his First Amendment rights was a substantial or motivating factor in the board's decision to terminate him, the burden will then shift to the board to establish by a preponderance of evidence that the same decision as to Johnson's termination would have been reached even in the absence of constitutionally protected conduct. Id. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 484; accord, Givhan v. Western Line Consolidated School District, supra; Durango School District No. 9–R v. Thorpe, supra. We hasten to add that where the employee has shown that his constitutionally protected conduct was a substantial or motivating factor in the decision to terminate him from employment, the trial court must carefully scrutinize the evidence to be sure that the employer's asserted reasons for termination are not a mere pretext for what is really retaliatory action taken against the employee's exer-

cise of free speech. That there might be an admixture of permissible and impermissible motivations in the termination decision will not serve to validate that decision. Rather, the burden on the employer is to purge its decision of an unconstitutional motivation by proving that the decision had an independent source unrelated to the unconstitutional taint. *See Mt. Healthy City School District v. Doyle, supra,* 429 U.S. at 286–87, 97 S.Ct. at 575–76, 50 L.Ed.2d at 483; L. Tribe, *American Constitutional Law* § 12–5 at 591–94 (1978).

As previously stated, the trial court's findings do not address the question whether the board would have discharged Johnson for reasons unrelated to his asserted free speech activities in connection with the Rocky Flats Plant. Upon remand, assuming the court is satisfied that Johnson's activities in connection with the Rocky Flats Plant were constitutionally protected and that these activities were a substantial or motivating factor in the board's decision to terminate his employment, it must then determine whether the board proves by a preponderance of evidence that it would have discharged Johnson irrespective of his Rocky Flats activities.

## IV.

Because the court failed to apply the appropriate constitutional standards in resolving Johnson's claim for a temporary injunction, further proceedings are necessary on this aspect of the case. If the court upon remand considers the present state of the record adequate to resolve Johnson's request for a temporary injunction, then it may enter findings of fact and conclusions of law without taking additional evidence. If, however, the court regards the present record as inadequate, then it should permit the parties to present additional evidence and enter appropriate findings and conclusions.

The judgment is vacated and the cause is remanded for application of the appropriate constitutional standards in accordance with the views herein expressed.