Sandra R. KEMP, Petitioner,

v.

STATE BOARD OF AGRICULTURE and Colorado State University; Roselyn Keller, in her capacity as Conciliation Officer of Colorado State University; Dana Hiatt, in her capacity as Director of the Office of Equal Opportunity at Colorado State University; and Phillip Austin, in his capacity as President of Colorado State University, Respondents.

No. 89SC696.

Supreme Court of Colorado, En Banc.

Dec. 10, 1990.

Rehearing Denied Jan. 14, 1991.

**500**

Holland & Hart, A. Bruce Jones, Ian S. Karpel, Denver, for petitioner.

Hall & Evans, Daniel R. Satriana, Jr., Marlene T. Gresh, Sean R. Gallagher, Duane Woodard, Atty. Gen., Tim Arnold, Deputy Atty. Gen., Lee Combs, Sp. Asst. Atty. Gen., State Bd. of Agriculture, Denver, for respondents.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *Kemp v. State Board of Agriculture,* 790 P.2d 870 (Colo.App.1989), and we now affirm. The petitioner, Sandra Kemp, was a black female employee of Colorado State University (CSU), and was assigned as an extension agent in a predominately white community in Southern Colorado from August 16, 1982, until August 30, 1985. She alleges that starting in the Fall of 1983, she received lower than normal performance evaluations, and in the Spring of 1984 received a salary increase she felt was too low. In November 1984, Kemp filed a formal complaint with the CSU Equal Opportunity Office pursuant to CSU's internal grievance procedure manual [1] charging her co-workers and supervisors with discrimination due to her race and sex. The griev-

ance procedure permits the complainant to elect either a formal or informal complaint and either an open or closed hearing. If a formal complaint is filed, a hearing panel of the school's equal opportunity council takes evidence and then prepares a written report setting out its findings and any resulting recommendations.[2] A formal complaint also means that the complainant has a right of appeal to an appeals committee and the president of the university. The grievance procedure also stated "complainants may pursue remedies in other agencies and the courts while simultaneously invoking these procedures *informally.*" (Emphasis added.)[3] There is no definition in the internal procedure manual of a "closed hearing" nor any indication of what sanctions will be imposed for violating the procedure or criteria for determining appropriate sanctions. Kemp elected to file a formal complaint and to have a closed hearing.

On December 7, 1984, Kemp contacted the office of United States Senator William Armstrong (R. Colorado) and requested that his office monitor her complaint. Senator Armstrong's office responded by requesting that Kemp keep the senator advised. On January 27, 1985, after the hearing but before a decision had been rendered, Kemp's husband wrote another letter to Senator Armstrong's office on behalf of Kemp and with her knowledge and assistance. The letter asserted irregularities in Kemp's grievance hearing, that a university official had suggested Kemp quietly resign, and requested a review by the local United States Attorney's Office of "possible civil rights violations."[4]

---

1. Grievance Procedure for the Resolution of Complaints of Discrimination (hereinafter Grievance Procedure).

2. Grievance Procedure at 4.

3. Grievance Procedure at 1.

4. The full text of the letter is:

My wife, Sandra, recently had an EEO hearing at CSU. I appeared as one of the witnesses.

During the proceedings, we both observed too many irregularities practiced by the EEO office to prejudice the case in the defendants'

favor. We are presently awaiting the panel's decision.

Regardless of the decision, it has *even* been suggested that my wife quietly resign with the promise of good references because nothing will be probably done to the perpetrators.

Would your office please assist my wife in maintaining her employment at CSU? As you mentioned in your letter to Sandra dated December 13th, the Senator may request a *proper* review of my wife's complaints by the U.S. Department of Agriculture. Perhaps you might also, at your discretion, request an investigation of possible civil rights violations by the U.S. Attorney's Office.

On February 13, 1985, the office in charge of investigating discrimination complaints at CSU wrote Kemp and informed her that the proceedings in her case had been "voided." The school stated that Kemp had violated the grievance rules by informing an outside party, Senator Armstrong, which was prohibited when the complainant elected to proceed with a formal complaint and a closed hearing. The letter informed Kemp that all internal mechanisms for lodging a discrimination complaint were exhausted.

Kemp appealed to the university president, who upheld the decision on March 22, 1985. Thereafter, Kemp filed a complaint in state district court alleging that CSU's action in terminating her proceedings violated her state constitutional rights and her federal first amendment rights to free speech, petition, and due process of law under the fourteenth amendment in violation of 42 U.S.C. § 1983. Following limited discovery, the parties filed cross motions for summary judgment. On November 5, 1987, the trial court ruled that her speech was not a matter of public concern and was not protected under *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The court further ruled that even if protected, the state's interest in maintaining its procedures outweighed Kemp's interest and granted summary judgment for the state.

The court of appeals affirmed in *Kemp v. State Board of Agriculture*, 790 P.2d 870 (Colo.App.1989), holding that Kemp's speech was not protected, and did not address the balancing of Kemp's interests with those of the state. For the reasons set forth in this opinion, we affirm.

## I

The tension between the free speech rights of a state employee and the interests of a state employer was first addressed by the United States Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *Pickering* reversed a decision upholding the termination of a public school teacher for writing a letter to the editor addressing an upcoming school bond issue. The Court held that "absent proof of false statements knowingly or recklessly made ..., a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. at 1737. *Pickering* stated the problem was to "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734. The teacher's relationship with the school board was "not the kind of close working relationship[ ] for which it [could] persuasively be claimed that personal loyalty and confidence [were] necessary to" the state's interests in maintaining discipline or harmony within the workplace. *Id.* at 570, 88 S.Ct. at 1735.

In *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court held that the state was not constitutionally precluded from choosing not to renew a teacher's contract unless the teacher could show that the protected conduct at issue "played a 'substantial part' in the actual decision not to renew," and the state could not show that it would have reached the same decision "even in the absence of the protected conduct." *Id.* at 285–87, 97 S.Ct. at 575–76. Then, *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), upheld the termination of an assistant district attorney based partially on her exercise of constitutionally protected speech. Once the employee showed that the speech "touched upon a matter of public concern," *id.* at 149, 103 S.Ct. at 1691, and was therefore protected, the burden shifted to the state to justify the termination by showing that its interests outweighed the employee's interests in exercising her free speech rights. *Id.* at 150, 103 S.Ct. at 1691.

Clarifying the balancing test, *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), held that a constable's office clerk could not be fired for stating that she hoped the President would

be assassinated. "Where, as here, an employee served no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal." *Id.* at 391–92, 107 S.Ct. at 2900 (government's interest may be greater when speaker is in a policymaking role). The Court stated that the employee's speech "dealt with a matter of public concern," was a substantial motivation in the decision to fire the employee, and that the state's interests did not outweigh those of the employee. *Id.* at 386–92, 107 S.Ct. at 2897. In performing that balancing, "the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Id.* at 388, 107 S.Ct. at 2899.

In *Johnson v. Jefferson County Board of Health,* 662 P.2d 463, 473 (Colo.1983), we said, "If the government could deny a benefit to a person solely because of the exercise of constitutionally protected speech, the exercise of that freedom would in effect be penalized and inhibited." In adopting the *Mt. Healthy* test, we stated, "The free speech interest of most government employees generally will be substantial enough to prohibit discharge or termination solely because of the employee's exercise of First Amendment rights on a matter of public interest." *Id.*[5] *See also Durango School Dist. v. Thorpe,* 200 Colo. 268, 275, 614 P.2d 880, 885 (1980) (balance will be struck in favor of the government "when it is demonstrated that the teacher's speech activities constitute a material or substantial interference with the teaching program, appropriate discipline, or the rights of others." (Citing *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).) It is with these factors in mind that we must review Kemp's claim that she was denied an employment benefit in retaliation for an exercise of a constitutionally protected activity.

## II

 As a preliminary matter, CSU has implicitly raised the issue that *Connick* is limited to those situations in which the employee is actually terminated, which Kemp was not. In *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), the Court said that the state "may not deny a *benefit* to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." (Emphasis added.) *See also Johnson,* 662 P.2d at 472 (state cannot deny a *"benefit* to a person solely because of the exercise of constitutionally protected speech....") (Emphasis added.) Although Kemp was not actually terminated because of the letter, she was denied an important employee benefit of access to the internal grievance procedure. The state cannot deny a benefit when it is constitutionally precluded from firing the employee for the same reason. CSU's assertion that *Connick* does not apply to these facts must therefore be rejected.

## III

To determine whether CSU's actions violated Kemp's constitutional rights, we employ the four-step test created by the foregoing cases. First, Kemp must show that her speech "touch[es] upon a matter of public concern." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. Second, if the speech is a matter of public concern, the burden shifts to the state to show that its interests outweigh the employee's interest, "as a citizen, in commenting upon matters of public concern...." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. Third, if the state shows that the *Pickering* balance is weighed in its favor, it is unnecessary to go further because the state has met its burden of showing that it terminated the employee or denied her a benefit for legitimate reasons. If not, the employee must show that the protected activity was a substantial or motivating factor in the school's decision to deny the benefit. *Mt.*

---

**5.** In *Johnson,* we also stated, "The constitutional balance weighs more heavily in favor of the governmental interest in efficient operations [ ] in the case of policymaking employees." *Johnson,* 662 P.2d at 473. CSU does not argue that Kemp was in a policymaking role.

*Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Finally, the school may still defeat the employee's claim if it can show that it would have reached the same decision even in the absence of the protected conduct. *Id.; see also Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).

### A

■ Kemp's first burden is to show, by a preponderance of the evidence, that her speech touched on "matters of public concern" and therefore fell within the first amendment's protection. *Connick,* 461 U.S. at 138, 103 S.Ct. at 1684; *Johnson,* 662 P.2d at 472. If not, it is unnecessary to scrutinize the reasons for terminating the proceeding. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689.

The court of appeals upheld the trial court finding that Kemp's letter was not addressed to a matter of public concern since it focused "on [Kemp's] concerns about irregularities in her own hearing, rather than seeking to alert the senator or the public to broader discriminatory problems at the university." 790 P.2d at 872.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690 (footnote omitted).

Some courts have chosen to look primarily at motivation, or the "point" of the speech. *See, e.g., Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987) ("*Connick* test requires us to look at the *point* of the speech in question" (citations omitted)); *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985) (is the employee's point to bring wrongdoing to light, raise issues of public concern because they are public con-

cern, or to further some purely private interest?) Undoubtedly, Kemp's point in sending a letter was partially, if not entirely, motivated by self interest. Other courts, however, have not made that the sole determinative question. In *Johnson v. Lincoln University of Commerce,* 776 F.2d 443, 452 (3d Cir.1985), the court said, "Speech touches upon a matter of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" (Quoting *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689.) "[T]he mere fact that an employee's statement is an 'outgrowth of his personal dispute' does not prevent some aspect of it from touching upon matters of public concern, as *Connick* itself makes clear." *Johnson,* 776 F.2d at 451.

In *Connick,* an assistant district attorney, who was unhappy about a pending transfer, circulated a questionnaire soliciting her co-workers' comments on office management. For the most part, the Court viewed Myers' speech as "mere extensions of Myers' dispute over her transfer...." *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690. The Court did find, however, one question directed to whether attorneys were pressured to work on political campaigns to be of public concern, notwithstanding that the question arose out of Myers' personal dispute or that it was aimed at solving a private problem. *Id.* at 149, 103 S.Ct. at 1691. *See also Zamboni v. Stamler,* 847 F.2d 73, 77–78 (3d Cir.), *cert. denied,* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988) (employee's speech touched upon public concern even though his sole purpose was to invalidate a promotional plan adverse to him); *Rode v. Dellarciprete,* 845 F.2d 1195, 1202 (3d Cir.1988) ("Dismissing Rode's speech as unprotected merely because she had a personal stake in the controversy fetters public debate on an important issue because it muzzles an affected public employee from speaking out."); *Wren v. Spurlock,* 798 F.2d 1313, 1317 (10th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987) (employee's letter complaining of sexual harassment public concern although letter

arose from conflict between teacher and principal).

Here, Kemp wrote a letter to her elected representative complaining of irregularities in the grievance hearing, alerting the senator to the possibility that no action would be taken regardless of the outcome, and requesting that the United States Attorney's Office "investigate[ ] possible civil rights violations."

At least part of Kemp's letter seems directed at exposing racial discrimination problems within the university. We recognize that there is a significant difference between questions surrounding the fairness of office transfer policies, as in *Connick*, and questions concerning racial discrimination, which are presented here. "[I]t is clear that [the employee's statement in *Givhan* ] concerning School District allegedly racially discriminatory policies involved a matter of public concern." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. It cannot be said speech that touches upon discrimination within a university system does not relate to "any matter of political, social, or other concern to the community." *Johnson*, 776 F.2d at 452. This case is similar to *Rode*, in which the Third Circuit emphasized that the plaintiff was not merely complaining about being mistreated, "she claimed that she was a victim of retaliation arising out of racial animus. : ..." 845 F.2d at 1201. "If, in fact, the employee's speech is largely composed of matters of only personal concern, that becomes relevant when the balancing is done, not in the determination whether the speech touches upon matters of public concern." *Johnson*, 776 F.2d at 451.

Although the context within which Kemp's letter arose was one in which she had a personal stake, it was nevertheless a context in which charges of racial discrimination had been filed. The very purpose of the grievance was to address alleged discrimination, which the grievance manual defines as any act or policy that violates any of a multitude of state and federal anti-discrimination laws, all of which are public matters.[6] Moreover, the form of the

speech—a letter to a United States senator, only lends credence to the argument that the speech touched on a matter of public concern.

█ When an employee alleges a colorable claim that a university is guilty of racial discrimination, it is a matter of public concern, and the fact that she has a personal stake in the outcome does not alchemize that claim into a purely private matter in which the public has no interest.

## B

█ In holding that Kemp's letter touched on a matter of public concern, we have only resolved one part of the *Connick* test. Even though speech may be of public concern, it is still incumbent upon the court to balance the interests of the speaker with those of the state in its capacity as an employer. "The inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7. That balancing requires "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 150, 103 S.Ct. at 1692. In this case, CSU argues that its interests are in maintaining the integrity of its grievance procedure, which Kemp violated. Here, the state "bears a burden of justifying [terminating the procedure] on legitimate grounds." *Id.* Relevant factors include "the manner, time, and place of the employee's expression ... [and] the context in which the dispute arose." *Rankin*, 483 U.S. at 389, 107 S.Ct. at 2899.

█ CSU's grievance manual provides that an employee may select a formal or informal procedure, and an open or closed hearing. If the employee selects a formal procedure, she may not seek remedies in other agencies or the courts until the hearing is complete. Although the manual neither defines what a closed hearing is, nor specifies what sanctions will occur if any of the provisions are violated, "closed" clearly indicates that outside forces may not be

---

6. Grievance Procedure at 2.

invited into the proceedings until a decision has been rendered. Kemp's interest here, then, is slight. She was given the choice to elect a formal or informal procedure, and an open or closed hearing. She chose a formal, closed proceeding and then violated that procedure by involving an outside individual in hopes of influencing a favorable result.

An employee cannot invoke the first amendment's protection by simply using the term "discrimination." There must be some attempt to inform the public of discriminatory practices rather than a motive primarily aimed at simply "gather[ing] ammunition for another round of controversy with her superiors." *Connick*, 461 U.S. at 148, 103 S.Ct. at 1690. Kemp's letter is entirely couched in terms of what the senator could do to help her, rather than exposing an alleged university discrimination problem to the public. Kemp's reference to the United States Attorney's Office seems primarily aimed at eliciting an investigation of her complaint, rather than alerting the public to a larger problem. In other words, the sole motivating factor for the letter was to further Kemp's own cause, rather than a larger, more publicly important problem. As in *Connick*, "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the [state]." 461 U.S. at 153, 103 S.Ct. at 1693. Kemp's letter "touched on matters of public concern in only a most limited sense; [Kemp's letter], in our view, is most accurately characterized as an employee grievance concerning internal office policy." *Id.* at 154, 103 S.Ct. at 1694.

Balanced against Kemp's interest is the school's interest in having an internal grievance procedure that is followed by all parties. Although unartfully drawn, CSU's grievance procedure is clear enough for Kemp to have understood the consequence of selecting a particular method for solving her complaint. That she decided to go outside that procedure cannot now be held against the university.

The state has met its burden of showing that Kemp's letter "impair[ed] discipline by superiors or harmony among co-workers, [had] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[ed] the performance of the speaker's duties or *interfer[ed] with the regular operation of the enterprise*." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899 (quoting *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37) (emphasis added). That Kemp's letter is composed of matters of only personal concern to her weighs against her in the balancing. *Johnson*, 776 F.2d at 451. Given the circumstances, the trial court correctly found that CSU's interest in maintaining its grievance procedure outweighed whatever interest Kemp had.

## IV

 Neither this court nor the United States Supreme Court has addressed the problem of whether a person's right to petition under the first amendment is balanced under the *Connick* test. Even assuming that Kemp's right to petition was implicated, the *Pickering/Connick* balancing test is equally applicable in deciding whether the state's interest as an employer outweighs the first amendment interest of the employee. There is no more of an absolute right to petition than there is to engage in speech. *McDonald v. Smith*, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) (petition clause does not grant absolute immunity to libel action):

[T]he Court's decisions interpreting the Petition Clause in contexts other than defamation indicate that the right to petition is [not] absolute. For example, filing a complaint in court is a form of petitioning activity; but "baseless litigation is not immunized by the First Amendment right to petition." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 [103 S.Ct. 2161, 2170, 76 L.Ed.2d 277] (1983); accord, *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 [92 S.Ct. 609, 613, 30 L.Ed.2d 642] (1972). Similarly, petitions to the President that contain intentional and reckless falsehoods "do

not enjoy constitutional protection," *Garrison v. Louisiana*, 379 U.S. 64, 75 [85 S.Ct. 209, 216, 13 L.Ed.2d 125] (1964)....
*Id.* at 484, 105 S.Ct. at 2790.

▪ At most, Kemp waives her right to petition for only the amount of time needed for the formal grievance procedure to run its course, and then only if she chooses that procedure. We can find no stronger interest here than Kemp had under the free speech clause, and the state's interest is equally compelling. Once again, the state has met its burden of showing that it terminated the procedure for legitimate reasons. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691.

## V

Because we hold that the state's interest outweighs Kemp's interest in her rights to free speech and to petition, it is unnecessary to go further and determine whether Kemp's conduct was a substantial or motivating factor in the school's decision to void the procedure, or whether the procedure would have been terminated absent the protected conduct.

Accordingly, we affirm the trial court and the court of appeals.

MULLARKEY, J., dissents and LOHR and QUINN, JJ., join in the dissent.

MULLARKEY, Justice, dissenting:

Although I agree with the majority's formulation of the four-step analysis used to examine Kemp's First Amendment claim, I do not agree with the application of that test to the facts of this case. In addition, I would address Kemp's due process claims and hold that CSU's actions violated Kemp's procedural due process rights. Accordingly, I respectfully dissent.

In this case Kemp alleged that she suffered racial and sexual discrimination both at work and during the grievance procedure. Kemp's husband wrote a letter to Senator Armstrong in connection with Kemp's complaint of racial and sexual discrimination before Colorado State Universi-

ty's (CSU's) Equal Employment Opportunity Office (EEO) and suggested that Senator Armstrong investigate "possible civil rights violations." The letter referred to "irregularities practiced by the EEO office" during the grievance proceedings and pointed out that a university official had suggested to Kemp that she quietly resign. *See* maj. op. at n. 4 (full text of letter). The letter to Senator Armstrong also included a complaint from another CSU employee alleging discrimination.

CSU "voided" Kemp's grievance because she contacted Senator Armstrong after completion of the hearing but before the hearing panel issued its decision. In its decision, the hearing panel found that Kemp's workplace was organized in a way that promoted both institutional sexism and racism.[1] The panel recommended, in addition to transferring Kemp to a comparable position elsewhere in the Extension Service, that Kemp's office review its personnel policies with the aid of an outside reviewer. Because the grievance was voided, however, the panel's decision had no effect.

Under the four-part test adopted by the majority, Kemp must first show that her speech "touched upon a matter of public concern." Maj. op. at 502 (quoting *Connick v. Myers*, 461 U.S. 138, 149, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983)). In this case Kemp's speech directly addressed a matter of extreme public concern. Allegations of race- and sex-based discrimination by a government employer are "a matter inherently of public concern." *Id.* at 148 n. 8, 103 S.Ct. at 1691 n. 8 (discussing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)).

The crucial question in this case is whether the State has met its burden of showing that its interest in maintaining the integrity of its grievance procedure outweighs Kemp's interests, "as a citizen, in commenting upon matters of public concern." Maj. op. at 502 (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568,

---

1. Although Kemp's grievance procedure was voided prior to the hearing panel's issuing its decision, the panel had reached its decision pri-

or to the voiding of the procedure and the decision is part of the record in this case. (Plaintiff's Exhibit 11).

88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). The State argues, and the majority agrees, that Kemp violated CSU's grievance procedure by contacting an outside individual after choosing the formal, closed proceeding to pursue her discrimination complaint. The majority concludes that the State's interest in the integrity of its procedure, which Kemp allegedly violated, outweighs Kemp's interests in commenting upon the racial and sexual discrimination she allegedly suffered.[2] I disagree.

Initially, I note that CSU's grievance procedure manual contained no prohibition preventing Kemp from contacting Senator Armstrong. CSU's grievance manual, in describing its policy, merely states: "Although the use of this procedure may obviate the necessity for complainants to resort to outside procedures in some cases, complainants may pursue remedies in other agencies and the courts while simultaneously invoking the procedure informally." The manual does not state that an employee who chooses to file a formal complaint may not seek remedies in other agencies or courts during the formal procedure. Moreover, even if this procedure prevents complainants who file formal complaints from simultaneously pursuing remedies in other agencies or courts, the provision does not prohibit Kemp from writing her senator. Senator Armstrong is not an agency or court.

The majority, without analysis, also chooses the most restrictive definition of a "closed" hearing: that "closed" means no outside forces may be involved in the proceedings until after the EEO has reached a decision. As the majority concedes, however, the manual does not define what a "closed" hearing is. Kemp argues that the hearing was completed before she contacted Senator Armstrong and that the "closed" hearing restriction did not continue until the panel rendered its decision. Given the absence of any definition of

"closed" hearing, Kemp's construction is not unreasonable and it is consistent with language in the policy indicating the panel will issue its decision within ten days "after the close of the hearing." The manual also does not specify sanctions for failure to follow the procedure for a "closed" hearing: When CSU wanted to impose sanctions elsewhere in the manual, it did so expressly. Therefore, it is unfair to read into the manual such a drastic sanction as the voidance of the grievance where neither guidelines for a "closed" hearing nor any sanctions are specified.

In this case, then, I would conclude that the integrity of the grievance procedure was not impugned. Kemp violated no regulations justifying the State's terminating her grievance proceeding. In addition, if the State had a strong interest in the integrity of its grievance procedure, the State could have issued more specific guidelines to govern the procedure. The State's interest in maintaining the integrity of the grievance procedure in this case therefore is minimal.

In concluding that the State's interest outweighed Kemp's interest, the majority also emphasizes that Kemp, in the letter to Senator Armstrong, sought help in her dispute with CSU rather than to communicate a racial and sexual discrimination problem to the public. Maj. op. at 504–505. Kemp's primary purpose of alerting Senator Armstrong to her alleged problems with racial and sexual discrimination at work and during the grievance proceedings, however, does not resolve the balancing of interests in the State's favor. The fact that the employee has a personal stake in the controversy that is the subject of the speech in question does not mean that the State's interest in fulfilling its responsibilities to the public outweighs the employee's interests in commenting upon matters of public concern.[3] *Rode v. Del-*

---

**2.** The majority reasons that, because Kemp was given a choice of proceedings, her interest in commenting upon the racial and sexual discrimination that she allegedly suffered is "slight." It is unclear, especially in light of Kemp's reference to "irregularities" in the process and the

suggestion that Kemp resign, why Kemp's having a choice of proceedings renders her interest in commenting upon this alleged discrimination "slight."

**3.** It should again be noted here that Kemp enclosed another employee's complaint alleging

*larciprete,* 845 F.2d 1195, 1202 (3d Cir. 1988) (holding that an employee suspended because of the employee's participation in an interview concerning her employment problems with a state police department "did not impermissibly affect the State's interest in the efficiency and performance of the police department" and that the employee therefore was entitled to damages arising from the suspension).

In addition, in balancing Kemp's interests against those of the State, the majority, relying heavily on *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, sidesteps several important factors for determining whether the State's interest outweighs Kemp's interests. Most importantly, the majority bypasses the importance of the content of Kemp's statements, the crucial factor in balancing the State's and the employee's interests. *Connick,* 461 U.S. at 150, 152, 103 S.Ct. at 1691, 1693 ("the State's burden in justifying a particular [action] varies depending upon the nature of the employee's expression.... We caution that a stronger showing [of the employer's justification for its actions in response to the employee's speech] may be necessary if the employee's speech more substantially involve[s] matters of public concern."). All of the statements for which Kemp seeks protection concerned alleged racial and sexual discrimination, a matter of inherently public concern. In *Connick,* on the other hand, all but one question of fourteen questions on the employee's questionnaire dealt with matters *not* of public concern. *Id.* at 148, 103 S.Ct. at 1690.

The Supreme Court also emphasized that the employee in *Connick* did not seek in distributing the questionnaire to bring to light any "breach of public trust." *Id.* at 148, 103 S.Ct. at 1690. The *Connick* employee's questions, all but one of which dealt with internal office policy, focused on "gather[ing] ammunition for another round of controversy with her superiors." *Id.*

The situation in this case is altogether different. It is a breach of the public trust when a government employer practices racial and sexual discrimination and Kemp's letter to Senator Armstrong dealt exclusively with allegations of such discrimination.

There also is no evidence that Kemp's letter reduced her abilities to perform her duties at work, nor is there any evidence that Kemp's speech disrupted her workplace, both important considerations in *Connick. Id.* at 151–52, 103 S.Ct. at 1692–93. Kemp, unlike the plaintiff in *Connick,* did not exercise her right of speech while at work. *Id.* at 153, 103 S.Ct. at 1693. As discussed above, the letter on behalf of Kemp to Senator Armstrong also did not violate any State policy. *Id.* at 153 n. 14, 103 S.Ct. at 1693 n. 14 ("The violation of such a rule would strengthen [the State's] position.") (citation omitted).

When all of these relevant factors are considered, I believe Kemp's interests in commenting upon racial and sexual discrimination at work and during the grievance procedure outweigh the State's interest in maintaining the integrity of its grievance procedure in this case. The two remaining issues from the four-part test adopted by the majority are questions of fact not before this court. Thus, I would reverse the judgment of the court of appeals with directions to remand the case to the trial court for resolution of the remaining issues of the majority's four-part test.

The majority also does not address the resolution of the plaintiff's due process claims. I would hold that CSU's actions violated Kemp's right to due process.[4]

This court previously has held that a public employer's failure to provide an employee with the benefits of a procedure as required by policies which it has adopted is a violation of the employee's procedural due process rights. *Department of Health v. Donahue,* 690 P.2d 243, 249 (Colo.1984). In *Donahue,* this court found that the Department of Health's failure to accord an

previous discrimination at CSU in her letter to Senator Armstrong.

**4.** Although the reviewing court did not address Kemp's due process claims, this court may still

address this issue since the parties raised the issue in their trial court pleadings. *Patterson v. Cronin,* 650 P.2d 531, 535 n. 9 (Colo.1982).

employee with a predisciplinary hearing as required by a personnel rule was a violation of that employee's procedural due process rights. We stated: "When the state, however, promulgates a regulation that imposes on governmental departments more stringent standards than are constitutionally required, due process of law requires those departments to adhere to those standards in discharging employees." *Id.* Once the State promulgated the rule, the employee had a right to that procedure before being discharged. The rule was binding until amended and was enforceable by an employee to whom it applied. *See also Ness v. Glasscock,* 781 P.2d 137 (Colo. Ct.App.1989) (police officer had right to be terminated only after strict compliance with the applicable termination procedures). All ambiguities in the policy should be construed against CSU as the drafter of the policy.

The grievance procedure involved in this case was approved by the State Board of Agriculture which oversees the operation of CSU. Once approved and adopted, the procedure became binding upon CSU. Thus, as in *Donahue,* Kemp had the right to have her grievance heard pursuant to the procedure. As discussed above, Kemp's letter to Senator Armstrong did not violate the grievance procedure. CSU's termination of Kemp's grievance proceedings thus violated Kemp's right to procedural due process as required by CSU's grievance procedure manual. In addition, even if Kemp violated the grievance procedure, the policy does not specify that such violation would result in the forfeiture of Kemp's right to pursue the proceeding altogether. Because of the importance of Kemp's right to have her grievance heard, I see no reason to read such a harsh penalty into the terms of the grievance procedure.

For the foregoing reasons, I respectfully dissent.

LOHR and QUINN, JJ., join in this dissent.